IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| KELLY BRODIE; DR. JOHN HEFFRON; KATHERINE KING; DR. MICHAEL LANGENFELD; KATHERINE RALL; JAMIE SHAW, | Case No.: _____ |
| Plaintiffs, | **COMPLAINT** **(JURY TRIAL DEMANDED)** |
| v. | |
| JERRY R. FOXHOVEN, in his official and individual capacities; RICHARD SHULTS, in his official and individual capacities; JERRY REA, in his official and individual capacities; MOHAMMAD REHMAN in his official and individual capacities; GLENWOOD RESOURCE CENTER; IOWA DEPARTMENT OF HUMAN SERVICES | |
| Defendants. | |

Kelly Brodie, Dr. John Heffron, Katherine King, Dr. Michael Langenfeld, Katherine Rall, and Jamie Shaw, plaintiffs in the above-captioned matter, by and through their counsel of record, for causes of action against defendants, state as follows:

## PRELIMINARY STATEMENT

This is a civil rights case, arising out of the Defendants' conspiracy to silence, punish and retaliate against the Plaintiffs—all dedicated, long-time medical and administrative professionals—for exercising their constitutional rights to freely express themselves and their concerns to government officials,  specifically management of the Glenwood Resource Center ("GRC") and their superiors at the Department of Human Services ("DHS"), as well as high-level State policy-makers, regarding Defendants' violations of an array of state and federal laws and

policies designed to protect the severely disabled and highly vulnerable patients at GRC, an intermediate care facility for the intellectually disabled (ICF/ID).  Plaintiffs bring their claims under the 42 U.S.C. § 1983, the First Amendment to the United States Constitution, under the Iowa Whistleblower Act and other provisions of state and federal law.

Beginning in September 2017, with the hiring of recently-terminated Superintendent Jerry Rea, a child psychologist from Kansas, Defendants embarked on a scheme to "creatively destroy" the elaborate healthcare and supervisory systems designed by the Department of Justice ("DOJ"), and other agencies, to safeguard the health, civil rights, and well-being of more than 200 residents of GRC ("DOJ Consent Decree").  These mandatory protections were implemented following the DOJ's prior prosecution of GRC for multiple violations of federal law.  Dr. Rea and other Defendants intended these improper changes in order to re-make GRC into a "relevant" research center through medical experimentation, including by conducting "sexual arousal research", and other research, and by exploiting the extremely fragile and dependent residents of GRC.

Defendants embarked on this conspiracy by first working to remove, punish or silence GRC's internal "guardians" of these patients, Plaintiffs, who collectively were instrumental not only in caring for the patients, but who also, in their protective capacity, were vocal in their opposition to Defendants' outlandish schemes and unlawful actions.  Defendants in addition removed or discouraged Plaintiffs from attending critical, interdisciplinary patient care meetings and from regular "WIG[1] meetings" that advanced numerous operational, clinical and management issues.  Plaintiffs publicly reported and voiced opposition to numerous instances in which Defendants acted to interfere with their independent medical judgment, to interfere with or punish

---

[1] WIG, at GRC, meant "Wildly Important Goals."

their reporting of misconduct by the Defendants, to violate GRC policy and established standards of care, and to deter them from speaking out on behalf of GRC's patient population.

At the same time Defendants were silencing and removing the professional guardians at GRC (i.e., the Plaintiffs), Defendants crippled GRC's organizational protections, policies, and reporting systems which were designed to protect GRC's residents and prevent a recurrence of the conduct that previously led to the DOJ Consent Decree.

By unilaterally changing or eliminating reporting protocols and patient-protection policies and meetings, while at the same time unlawfully altering patient medical records, improperly deleting and modifying GRC treatment policies and discouraging or punishing Plaintiffs' reports of patient abuse or harm to law enforcement and to state-policy makers, Defendants sought to conceal their efforts to both develop an unapproved research program and to reduce the costs of care to GRC residents. Collectively, Defendants' wrongful conduct not only caused severe financial and reputational harm and emotional distress to Plaintiffs, but also recklessly endangered the health and well-being of the State's most vulnerable citizens.

## THE PARTIES

1.      Plaintiff Kelly Brodie is a former Assistant Superintendent of Treatment Support Services, and two-time interim Superintendent, of Glenwood Resource Center. Ms. Brodie is a resident of Mills County, Iowa. Plaintiff Brodie served in various management roles at GRC, including as Assistant Superintendent and Interim Superintendent, from May 2003 until she was constructively terminated effective February 7, 2019.

2.      Plaintiff Dr. John Heffron is a physician who was formerly employed at Glenwood Resource Center. Dr. Heffron is a resident of Mills County, Iowa. Plaintiff Heffron served as a physician at GRC from on or about May 2009 until he was terminated effective March 2018.

3.      Plaintiff Katherine King is a former employee and guardian for two patients at the Glenwood Resource Center.  Ms. King is a resident of Mills County, Iowa.  Plaintiff King served as a Treatment Program Administrator at GRC from on or about August 8, 1975 until she was constructively terminated on March 30, 2018.

4.      Plaintiff Dr. Michael Langenfeld is a physician who was formerly employed at Glenwood Resource Center.  Dr. Langenfeld is a resident of Douglas County, Nebraska.  Plaintiff Langenfeld served as a physician at GRC from on or about September 2008 until he was constructively terminated on March 1, 2018.

5.      Plaintiff Katherine Rall is the former Director of Quality Management at Glenwood Resource Center.  Ms. Rall is a resident of Douglas County, Nebraska.  Plaintiff Rall served as Director of Quality Management at GRC from 2006 until she was suspended, then constructively terminated effective February 12, 2018.

6.      Plaintiff Jamie Shaw is a nurse practitioner formerly employed in such role at Glenwood Resource Center.  Ms. Shaw is a resident of Cass County, Nebraska.  Plaintiff Shaw served as a nurse practitioner at GRC from on or about May 2018 until she was terminated in May 2019.

7.      Defendant Jerry R. Foxhoven, is the former Director of the Iowa Department of Human Services and, upon information and belief, is a resident of Polk County, Iowa.  Defendant Foxhoven resigned in June 2019, and thereafter filed suit for wrongful discharge under Iowa Code § 70A.28, because he allegedly refused to participate in illegal activity.

8.      Defendant Jerry Rea is the former Superintendent of Glenwood Resource Center and, upon information and belief, is a resident of Mills County, Iowa.  Upon information and belief, Defendant Rea earned a Ph.D. in child development and child psychology.  According to a

4

December 30, 2019 letter from Defendant Shults, Defendant Rea was discharged as a result of "a mounting list of disregard of policies and procedures" and was ordered to vacate the GRC premises.

9.      Defendant Richard Shults was the Director of the Iowa Department of Human Services' Division of Mental Health and Disability Services and, upon information and belief, is a resident of Polk County, Iowa.  Defendant Shults recently retired from DHS on January 23, 2020.

10.     Defendant Mohammad Rehman is the Medical Director of Glenwood Resource Center and, upon information and belief, is a resident of Mills County, Iowa.  Upon information and belief, Defendant Rehman was, but is no longer, board certified in internal medicine. Defendant Rehman received a vote of "no confidence" from the GRC Medical Staff in late 2018, but currently remains employed there.

11.     Defendant Glenwood Resource Center is a State of Iowa owned and operated facility providing care for Iowans with severe mental and physical disabilities located in Mills County, Iowa.

12.     Defendant Iowa Department of Human Services is an agency of the State of Iowa with its primary offices located in Polk County, Iowa.

## JURISDICTION AND VENUE

13.     This lawsuit alleges, *inter alia*, the deprivation of plaintiffs' constitutionally guaranteed rights under color of state law.  As such, this Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and § 1343.

14.     The events at issue in this case transpired primarily, but not exclusively, in and around Mills County, Iowa.  Venue is therefore proper in this judicial district and division.

15.     Each of the claims asserted in this Complaint, other than those based on federal statute, are also being filed with the Iowa State Appeal Board pursuant to the Iowa State Tort Claims Act, Iowa Code, Chapter 669.

## FACTUAL BACKGROUND

16.     Glenwood Resource Center ("GRC") is organized under the Iowa Department of Human Services.  GRC is a Medicaid-certified Intermediate Care Facility for individuals with intellectual disabilities (ICF/ID).  More than 200 severely disabled adults reside at GRC.  These residents include those who are extremely vulnerable, non-communicative, non-ambulatory and who rely extensively on the medical and other professionals at GRC for their health and other needs, and indeed for their very survival.  Medical care and legal decisions for virtually all of these residents must be approved by, and receive the informed consent of, their duly-appointed legal guardians.

17.     GRC serves Iowans with intellectual disabilities and other physical, mental and developmental disabilities, and defines as its mission: "to prepare and support individuals to live in the community of their choice."  The individuals served by GRC are institutionalized or residential patients who live on the GRC campus and depend on their care and comfort from GRC employees.

18.     Plaintiffs all worked at GRC at various times between 2006 and 2019 and would have continued working at GRC past their separation dates but for the wrongful actions of, and hostile work environment created by, Defendants.

19.     Until at least September 2017, and the hiring of Defendant Rea as Superintendent of GRC, each of Plaintiffs were employees in good standing, with positive performance records, clean disciplinary records and a track record of devoted care to the residents of GRC.  Each of the

Plaintiffs employment was terminated, literally or constructively, by Defendants.  Each of the Plaintiffs were damaged by the hostile work environment created, supported and defended by the Defendants.

## DEPARTMENT OF JUSTICE CONSENT DECREE

20.     On or about November 24, 2004, the State of Iowa entered into a Consent Decree with the United States Department of Justice, in the matter styled *United States of America v. State of Iowa, et al.*, Case No. 4:04-cv-00636, in the United States District Court for the Southern District of Iowa, related to the conditions at GRC.[2]

21.     As noted in the Consent Decree, the Department of Justice determined that reasonable cause existed to believe "persons residing in or confined to . . . Glenwood were being subjected to conditions that deprived them of their legal rights and of their rights, privileges, and immunities secured by the Constitution of the United States."

22.     The Consent Decree required GRC to agree to a detailed, binding plan for compliance to correct the significant and numerous deficiencies identified by the Department of Justice.

23.     Among the various requirements applicable to GRC under the Consent Decree, GRC was required to provide a safe and humane environment, not to use prone restraints at all, to limit the use of any physical restraints, to obtain informed consent from guardians for GRC residents, to make use of interdisciplinary treatment and care teams, and to prepare written policies and procedures to ensure the use of recognized standards of medical care.

---

[2] A copy of the Consent Decree, and related compliance plan, is available on the Department of Justice website, at: https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/split_state_iowa_agree_12.24.04.pdf

24.    The Department of Justice determined that GRC came into substantial compliance with the terms of the Consent Decree in April 2010, as described in the Notice of Information filed by the Department.

25.    While GRC eventually came into substantial compliance with the terms of the Consent Decree, the formal termination of the Consent Decree did not eliminate the requirements or standards of care prescribed by the Consent Decree.  Instead, the minimal standards of care prescribed by the Consent Decree remain operative and currently define GRC's operational requirements and standards of care.

26.    On or about April 4, 2014, DHS created a revised Employees Manual applicable to Iowa's State Resource Centers, including GRC ("Manual").  According to the Manual, its policies "are a part of the state's good-faith effort to implement the provisions" of the DOJ Settlement Agreement and incorporated Plan.

27.    The Manual identified numerous mandatory requirements, clinical care protocols and policies applicable to GRC, and outlined the constitutional and legal rights of GRC residents.  Among other things, it contains specific prohibitions on the use of physical restraints, reflects the crucial importance of maintaining the independent medical judgment of GRC's treating physicians, the necessity of interdisciplinary care teams focused on the health and well-being of GRC residents, and the importance of reporting adverse patient care and other incidents and prohibiting workplace retaliation.

28.    Plaintiff Rall, in her role as GRC's Director of Quality Management, was required, among other things, to document, confirm and periodically report on GRC's compliance with the terms of the Consent Decree, including after the Notice of Information was filed ending Department of Justice oversight, and to ensure GRC complied with the policies, procedures and

laws governing the care to be provided at GRC.  At the conclusion of the DOJ Consent Decree, Plaintiff Rall continued to report any cases of abuse and neglect, specifically to the GRC superintendent in place at the time and the Department of Quality Management.

## DEFENDANT REA IS HIRED

29.    In September 2017, the Department hired Defendant Jerry Rea to act as Superintendent at GRC.

30.    Defendant Rea, prior to joining GRC, was Superintendent at the Parsons State Hospital and Training Center, a residential treatment, training and care facility operated by the state of Kansas.

31.    Defendant Rea also served as an adjunct assistant research professor at the University of Kansas.  Among Defendant Rea's research interests in Kansas were topics related to deviant sexual behavior and arousal, including with individuals with intellectual disabilities.[3]

32.    In 1998, prior to joining GRC, Defendant Rea received a patent for a device used to measure sexual arousal.  According to the U.S. Patent Office, the patent is for "[a]n apparatus and method for detecting and monitoring the sexual arousal of an individual while the individual is exposed to real-life sexual stimuli outside of a clinical or laboratory setting."  *See* United States Patent No. 5782778.[4]

33.    Upon information and belief, Defendant Rea was hired, in part, due to his close personal relationship with Defendant Shults, to whom Defendant Rea directly reported in his role as Superintendent of GRC.

---

[3]  A listing of articles believed to be attributable to Defendant Rea can be found at: https://www.ncbi.nlm.nih.gov/pubmed/?term=Rea%20JA%5BAuthor%5D&utm_source=gquery&utm_medium=search (last accessed February 5, 2020).
[4]  Information regarding Defendant Rea's patent can be located at: http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1=5782778.PN.&OS=PN/5782778&RS=PN/5782778 (last accessed February 5, 2020).

34.     Immediately upon arriving in Glenwood, Defendant Rea undertook a significant rehabilitation of his personal residence on the GRC campus.  Using approximately $60,000 of taxpayer funds, Defendant Rea completely renovated his personal residence at GRC, and utilized the services of GRC's entire maintenance team to assist in the process.  In doing so, Defendant Rea diverted the entire maintenance team from their regular GRC duties, which included maintaining safe, sanitary and habitable homes and grounds for GRC's vulnerable patients, for more than two months.

35.     Defendant Rea, upon taking his position as Superintendent, and with the knowledge and consent of his supervisors, Defendants Foxhoven and Shults, and with the active assistance of Defendant Rehman, undertook a process of dismantling the protective structures designed and implemented through the DOJ Consent Decree and DHS Manual.

36.     Defendant Rea began a process of what he described as "creative destruction" and "flattening" of the GRC management organization, in an attempt to cut costs at GRC and to make GRC more "relevant," as only he defined the term, as a research facility.

37.     As part of his plan for "creative destruction," Defendant Rea diluted or removed much of the carefully designed regulatory and medical care compliance structures at GRC by, among other things, eliminating weekly management team meetings, during which facility goals, priorities, budgeting, hiring, policies and procedures had been discussed and decided.  Weekly management team meetings had been held at GRC, at least, since 2003.

38.     In lieu of holding weekly management team meetings, Defendant Rea (a non-physician) took over sole authority and responsibility for facility management and policy decisions, limiting the role other senior managers, including the Plaintiffs, had played prior to his arrival.  In doing so, he removed those with institutional knowledge of, and experience with, the

DOJ Consent Decree and DHS Manual, as well as those most familiar with GRC's patient population.  Defendant Rea initiated regular meetings, using the acronym WIG, or Wildly Important Goals, but he excluded or discouraged all of the Plaintiffs from attending these WIG meetings.  As described below, Defendant Rea's unauthorized research plans were developed, promoted and discussed at these WIG meetings.

39.     Defendant Rea, in or about October 2017, announced he would not convene the GRC policy committee, as had been established GRC practice, before deleting or diluting numerous written policies that he felt were unnecessary.  Among other things, Defendant Rea modified GRC's long-standing policies on the use of physical restraints, over the objection and/or without consulting the Plaintiffs.

40.     Defendants Rea and Rehman also diluted and undermined the effectiveness of interdisciplinary teams, which had met regularly to discuss, coordinate and improve each patient's care, and were required by the Consent Decree and the Manual.

41.     Defendant Rea, in late 2017, drastically altered the compliance and reporting structures required by the DOJ Consent Decree and the Manual, and together with the other Defendants, created a work environment hostile to regulatory compliance, and actively discouraged reporting of patient care and other serious incidents.

42.     Defendants also began interfering with patient care decisions and interfering with the independent medical judgment of GRC's medical professionals, including the Plaintiffs.

### DEFENDANTS BEGIN CONDUCTING UNAUTHORIZED RESEARCH WITHOUT PATIENT CONSENT

43.     As part of efforts to make GRC "relevant," Defendants sought to transform GRC from a facility focused on patient care, into a research facility to further Defendant Rea's long-standing interest in clinical research involving sexual arousal and sexual deviancy, among other

things.  They intended to use, and did use, highly vulnerable GRC patients as the subjects, or "guinea pigs" in research experiments.

44.     Minutes of the WIG Meetings, which Plaintiffs were not encouraged to attend, reveal some of the troubling history of the unauthorized research programs Defendants were initiating, including a collaborative effort with individuals at the University of Kansas and Defendant Rea's former employer, Parsons, to conduct sexual arousal research and to publish the research findings using GRC patients as "subjects" of that research.

45.     Defendants planned sexual arousal research included numerous preparatory steps, including medication adjustments, meetings in Des Moines and Kansas, development of a portable GPS device for measuring sexual arousal, preparing draft research papers and articles on sexual arousal, plans for seeking additional outside funding and collaboration between GRC and Defendants Shults and Foxhoven.

46.     These WIG meetings also included discussions about research regarding the "pneumonia perfect care index" and other research.  It appears that none of the WIG meetings addressed consent by the GRC residents for this research.  These WIG meeting minutes reflect that the initial research proposal to KU was rejected in late 2018 because, among other things, such research had never been conducted on intellectually disabled individuals.  By contrast, the minutes report that KU's sexual arousal research would be conducted with male college students.  Despite the different and improper research population at GRC, Defendants continued to move forward with the planned research at GRC.

47.     Upon information and belief, prior to beginning research, including sexual arousal research, on GRC patients, Defendants failed to obtain informed consent from GRC patient guardians.  Defendants were forced to later scramble to get consent on behalf of patients that had

been experimented on after receiving notice of a new Department of Justice investigation of GRC in 2019.

48.     In support of sexual arousal research, Defendants directed the purchase of various tools to use during the therapy, using public funds.

49.     Included in the devices and tools Defendants directed to be purchased were silk sheet or silk boxer shorts, sexual lubricants, stock photos which included pornographic images, and a dedicated computer, software program and a joystick for the sole purpose of the Defendant's research.

50.     Defendants' purchases of these tools for his sexual research were made over the objection of Plaintiff Brodie, and Plaintiff Brodie's objections regarding the computer, software and joystick were overruled by Defendant Shults.

51.     Defendants' use of GRC patients as unknowing research subjects in these experiments, without consent, and without regard to the medical care being provided, constitutes a violation of the civil rights of those patients and violates the standards established by GRC in response to the Consent Decree and in the Manual.  Defendants' experiments also interfered with Plaintiffs' professional relationships with GRC patients and with the exercise of their independent medical judgment.

52.     To prepare GRC patients for their participation in these research activities, Defendants directed that patients' prescribed medications be changed.  For example, Defendants controlled the prescribing of "dopamine inhibitors" to patients in order to prepare them for the studies.  But as noted, GRC's patients suffered from multiple interrelated physical and intellectual disabilities and were continually prescribed a complex array of carefully calibrated medications, each of which could interact with other medications.  When a non-physician unilaterally adjusts

this medication mix, without understanding these related medications, the risk of patient harm is significant.

53.     Defendants' interference with patient treatment and Plaintiffs' medical judgments, for the purpose of facilitating this research, had the effect of causing harm to the patients, including by causing seizures and behavior that was later used by Defendants to justify the increased use of physical restraints, contrary to the standards established by the Consent Decree.

54.     Defendants' research activities were all known to and ratified by all Defendants.

## INTERFERENCE WITH INDEPENDENT MEDICAL JUDGMENT

55.     Defendant Rea, along with the GRC Medical Director, Defendant Rehman, regularly interfered, and attempted to interfere with the independent medical judgment and medical care being provided to patients by Plaintiffs Heffron and Langenfeld, both physicians, and Plaintiff Shaw, a nurse practitioner.

56.     In addition to his use of vulnerable patients for his sexual arousal research, Defendant Rea also sought to conduct amateur medical research on GRC patients, which led to his making medical decisions to promote his research ambitions and was contrary to the medical judgment of the GRC patients' primary medical providers.

57.     Upon information and belief, Defendant Rea—who is not a medical doctor—developed an interest in "hydration therapy" and an interest in the "Perfect Care Index" after reading certain medical journals, but without a medical background sufficient to safely implement effective research programs.

58.     As a result of Defendant Rea's interest in medical therapy research, Defendant Rea, with the assistance of his subordinate, Defendant Rehman, began to direct medical care for patients under the care of Plaintiffs Heffron and Langenfeld in order to test theories regarding hydration.

59.     Defendants Rea and Rehman also instituted policies, contrary to the medical judgment of GRC physicians, for "monotherapy," intended to limit the number of prescription medicines given to GRC patients.

60.     In doing so, Defendants Rea and Rehman overruled and directly interfered with the medical judgment of the patients' primary healthcare providers.

61.     After Plaintiffs were forced out of GRC, the quality of care severely declined because of the new facility leadership and its direction of medical care, and the rate of deaths and other adverse events for GRC patients increased significantly.

62.     This drastic increase in patient deaths, and other severe adverse outcomes, has resulted in a further investigation by the Department of Justice and the State of Iowa investigatory authorities, which investigations are ongoing.

## PLAINTIFFS' NUMEROUS COMPLAINTS WERE PUNISHED, SILENCED AND MET WITH RETALIATION AND REPRISALS

63.     Plaintiffs collectively were long-time stewards and guardians at GRC.  They were the voices for the severely disabled residents of GRC who could not speak for themselves.  For precisely this reason—that they had the professional skills and institutional knowledge necessary to maintain hard-fought programmatic and treatment protections—the Defendants systematically removed them and the structures they, at DOJ's direction, had implemented and managed.  Each of the Plaintiffs was exposed to a toxic and hostile work environment, suffered repeated public humiliation, loud and personal disparagement, and professional embarrassment.  Each suffered retaliation and reprisals for making public reports, to their superiors and to policy makers at DHS, about Defendants misconduct.  Plaintiffs' public reports to the Superintendent, the Medical Director, to senior policy makers at DHS, to Child Protective Services, to the Division of Inspection and Appeals, to the Board of Medicine, to OSHA, and others were numerous, ranging

from patient care complaints, patient care incidents, employee safety incidents, unauthorized policy changes, non-compliance with the DOJ Consent Decree, payroll audit violations and others; each of these public and private complaints were met with reprisals, retaliation, disparagement, adverse employment actions and other punishments; other complaints, such as the vote of No Confidence in the Medical Director, were simply ignored.  Defendants' ongoing unlawful activity also placed Plaintiffs in an untenable position: if they continued at GRC and were viewed as participating in the improper conduct or following the medical and other directives from Defendants, they faced the risk they would be exposed to potential legal sanction, either by law enforcement or supervising licensure authorities.  Defendants' collective conduct created a hostile work environment for all the Plaintiffs, that not only damaged each of the Plaintiffs, but placed the residents of GRC at grave risk.

64.     In response to the various complaints and objections raised to Defendant Rea's leadership, and the ratification of his bad acts by Defendants Foxhoven, Shults and Rehman, each of Plaintiffs faced acts of reprisal, public disparagement, punishment and retaliation, up to and including demotions, reprimands, reductions in duties, suspensions and termination.

**PLAINTIFF HEFFRON**

65.     Without regard to proper medical care, but instead to reduce costs associated with client care, Plaintiff Heffron was repeatedly directed to drastically alter the manner and methods of care he determined to be appropriate for his GRC patients.  Indeed, he was reprimanded for providing "too much care."

66.     For example, Plaintiff Heffron was singled out for monthly meetings with Defendant Rehman in which Defendant Rehman criticized Plaintiff Heffron's use of "too many" laboratory tests, diagnostic tests, such as CT scans, x-rays or ultrasounds, on sending severely ill

patients to local hospital emergency rooms that Plaintiff Heffron, in his medical judgment, determined to be appropriate for his largely non-communicative, severely disabled patients.  But despite these formal reprimands and attempted interference, Plaintiff Heffron refused to compromise his medical judgments.

67.     Defendant Rehman's repeated interference in Plaintiff Heffron's medical decision making and relationship with his patients, and public criticism of Plaintiff Heffron's medical decisions, had an adverse effect on Plaintiff Heffron's reputation within and outside of GRC.

68.     Defendant Rehman directed Plaintiff Heffron to find ways to order fewer labs and tests for his patients, despite Plaintiff Heffron's medical judgment that such tests were necessary.

69.     Plaintiff Heffron was publicly disparaged and was criticized by the Medical Director, Defendant Rehman, upon information and belief, with the approval of Defendants Shults and Rea, for using "too much" diagnostic care and treatment, and for sending too many patients to area hospitals, instead of treating them at GRC, and for using rural ambulances to transport patients.

70.     The vast majority of patients sent by Plaintiff Heffron to area hospitals were admitted by the receiving hospital, demonstrating the need for advanced care, but Plaintiff Heffron continued to be regularly criticized for the costs of treatment he provided.

71.     The effect of Defendants' many efforts to interfere with the independent medical judgment of Plaintiffs, would have been to jeopardize client care and to interfere with Dr. Heffron's relationship with his patients and other care providers.

72.     Ultimately, Defendants terminated Plaintiff Heffron in March 2018.  But when Plaintiff asked why he was being terminated, or when he had been prematurely suspended,

Defendants refused to give him an answer, and refused to tell him of a single patient care or other reason during his long tenure at GRC.

73.     Upon information and belief, Defendants initiated a Board of Medicine complaint against him nearly two years after his termination, for the purpose of creating a pretext or justification for terminating him without any explanation or lawful purpose.  Defendants' complaint to the Board was made in bad faith, as a reprisal, and contrary to GRC policy and procedure, and relates to alleged patient care matters that Defendants refused to discuss with Plaintiff Heffron at the time of his suspension, termination or thereafter.

**PLAINTIFF RALL**

74.     Plaintiff Rall complained to Defendant Rea about his decision to eliminate the policy committee so that he could unilaterally determine which GRC policies were necessary or unnecessary and change or eliminate policies which tied his hands.

75.     At least twice, in meetings in front of other GRC staff members, Defendant Rea informed Plaintiff Rall that despite her formal role as Director of Quality Management, he did not welcome her discussing compliance matters, regulations, policies or best practices, and did not want to receive her input regarding his proposed changes.  In response to her complaints, Plaintiff Rall was laughed at, ignored and punished.

76.     The same month Plaintiff Rall complained about the significant changes Defendant Rea was unilaterally making, she was called into a meeting with Defendant Rea and the GRC human resources manager.

77.     Plaintiff Rall was informed that part of her job duties, overseeing the training of GRC employees, (which was mandated by the Manual), would be removed from her list of responsibilities.

78.     Plaintiff Rall complained to Defendant Rea that removal of training duties from Plaintiff Rall's job responsibilities would constitute a change in classification and would result in Plaintiff Rall being demoted.

79.     Plaintiff Rall's continued efforts to discuss training matters at GRC, and the need for training to be handled in a manner consistent with established compliance policies and practices, were ignored by Defendant Rea.

80.     Plaintiff Rall was then informed that she would be demoted, and she was continually subjected to harassment, intimidation, retaliation and reprisal.

81.     Upon information and belief, Plaintiff Rall's exercise of her oversight duties, and her public complaints regarding Defendant Rea's conduct, led to Plaintiff Rall being placed, without explanation, on indefinite suspension.  Plaintiff Rall continued on suspension, with no explanation provided, until February 12, 2018.

82.     Plaintiff Rall, having become aware of the GRC staff's awareness of her suspension, learned that her reputation had been damaged, that her authority with GRC had been undermined and she could no longer properly perform her oversight and compliance duties.

83.     Defendant Rea's actions intimidated Plaintiff Rall and interfered with her ability to perform her oversight responsibilities, and her duty to identify and report the violations of standards and laws occurring at GRC, since she reasonably feared Defendant Rea would take further retaliatory actions against her, as he had done repeatedly in the few short months after he had been hired.

84.     Upon information and belief, Plaintiff Rall's demotion and suspension were reprisals to punish her for questioning Defendant Rea's misconduct and efforts to implement changes that would violate long-standing policies and standards.

85.     Upon information and belief, Defendant Rea sought to eliminate the compliance and reporting functions that Plaintiff Rall was responsible for, in order that he could reduce training, regulatory compliance and protective practices and policies that had previously been required by the Consent Decree, the DHS Manual, and Iowa and federal law.

86.     Plaintiff Rall was constructively discharged from GRC as a result of the hostile work environment created by Defendant Rea, the indefinite, pretextual suspension imposed on Plaintiff Rall, and the damage done to Plaintiff Rall's reputation and authority as a result of Defendant Rea's actions.

## **PLAINTIFF BRODIE**

87.     Plaintiff Brodie, who had twice served as interim Superintendent at GRC, and primarily as Assistant Superintendent of Treatment Support Services, had, since 2003, been a member of weekly management team meetings.  In the weekly management team meetings, facility goals, priorities, budgeting, hiring, and GRC's mandatory policies and procedures were discussed and managed.

88.     After Defendant Rea joined GRC, however, Defendant Brodie was no longer allowed to attend any such meetings and was removed from her role in setting policies for management of GRC.  This demotion removed a significant aspect of Defendant Brodie's job duties and was a significant and retaliatory demotion.

89.     Instead of being invited to weekly management team meetings, the only further contact Plaintiff Brodie had with Defendant Rea was to be called into his office to be publicly berated for perceived slights on Defendant Rea.

90.     Defendant Rea told Plaintiff Brodie that he intended to "flatten" the GRC organization, taking all management upon himself, and intended to engage in "creative destruction" of GRC's management medical care and compliance structures.

91.     Defendant Rea harassed Plaintiff Brodie almost daily from the time he was hired until Plaintiff Brodie, feeling threatened and fearing termination, took leave from GRC in October 2018.

92.     In August 2018, Defendant Rea, seemingly intent on eliminating Plaintiff Brodie from GRC, began a period of harassment and reprisal due to Plaintiff Brodie's role in conducting an audit of one of Defendant Rea's preferred employees, his Human Resources Director ("HR Director").

93.     After Plaintiff Brodie identified discrepancies in the payroll reporting of the GRC human resources staff, and reported such discrepancies to Defendant Rea, Plaintiff Brodie was targeted by Defendant Rea and the HR Director in a pretextual investigation regarding Plaintiff Brodie's hiring of a new employee.

94.     Plaintiff Brodie was called into a meeting with Defendant Rea and the HR Director in which her role in the audit of the human resources department was tied to the investigation of her hiring practices and in which she was threatened with termination.  Plaintiff Brodie was called in to be loudly berated and threatened in multiple meetings with Defendant Rea and attended or observed by others.

95.     In addition to her audit of the human resources department, Plaintiff Brodie also reported to Defendant Shults concerns she had with Defendant Rea's spending of taxpayer funds, both with respect to his research program, including the expenditure of State funds on pornography, and his exorbitant remodel of the Superintendent's home on campus.

96.     Plaintiff Brodie, in addition to complaining to Defendants Rea and Shults about the conditions and improper activities at GRC and by Defendant Rea, also wrote to Defendant Foxhoven in October 2018 regarding her concern that she was being targeted and retaliated against because she would not remain silent in the face of Defendant Rea's conduct.

97.     Defendant Shults disregarded Plaintiff Brodie's complaints and took no action. Plaintiff Brodie was further warned by a DHS employee familiar with Defendant Shults, that Plaintiff Brodie should "tread lightly" in making complaints to Defendant Shults due to his long-standing personal relationship with Defendant Rea.

98.     Plaintiff Brodie also faced reprisals for her reporting of a serious employee injury to OSHA, and for refusing to terminate GRC's safety director for being "too aggressive" in her oversight duties.

99.     As a result of the non-stop harassment, intimidation and threats made by Defendant Rea, Plaintiff Brodie took leave from GRC and subsequently was forced to leave GRC due to the hostile environment caused by Defendants.

## PLAINTIFF LANGENFELD

100.    Plaintiff Langenfeld on multiple occasions criticized the activities of Defendants Rehman and Rea. Plaintiff Langenfeld, along with other medical providers, including Plaintiff Heffron, in or around November 2017, held a vote of no confidence in Defendant Rehman, GRC's Medical Director, to object to continued mismanagement of medical affairs by Defendant Rehman. GRC's Medical Staff unanimously supported the vote of no confidence.

101.    The Medical Staff's vote of no confidence in Defendant Rehman was conveyed to Defendant Rea. Plaintiff Langenfeld confronted Defendant Rea about the vote of no confidence, but Defendant Rea failed to take any action in response and failed to address any of the issues

raised by the GRC Medical Staff.  Plaintiff Langenfeld further voiced these concerns with Defendant Shults and Foxhoven, who failed to address the Medical Staff's concerns.

102.    Approximately, one month after the vote of no confidence, Plaintiff Heffron was suspended without cause, and later terminated without cause.

103.    Plaintiff Langenfeld further complained after Defendant Rehman hired a new physician, Dr. A., to provide neurological care to GRC patients.  As noted by Plaintiff Langenfeld, Dr. A included incorrect information on his resume and did not have any board certifications or identifiable experience as a neurologist.  Indeed, Dr. Langenfeld confronted Dr. Rehman about the fact Dr. A.'s resume was inaccurate.

104.    Because Dr. A was not a neurologist, Plaintiff Langenfeld refused to refer his patients to Dr. A for neurological care.

105.    Plaintiff Langenfeld personally observed a lunch meeting between Defendant Rea and a DHS administrator on GRC campus.  During this lunch meeting, the sexual arousal studies to be conducted by Defendant Rea and his team were discussed.

106.    Upon information and belief, DHS administration, including Defendants Shults and Foxhoven, were informed by at least some of Plaintiffs about the plan to conduct sexual arousal research on the vulnerable GRC population, and ratified those activities on behalf of DHS and the State of Iowa.

107.    Plaintiff Langenfeld also complained about the wrongful suspension of Plaintiff Heffron to Defendant Rehman.  Defendant Rehman declined to share any information with Plaintiff Langenfeld regarding the suspension and termination of Plaintiff Heffron, even though Dr. Heffron was one of the only three primary care physicians at GRC who were assigned to care for GRC's more than 200 residents.

108.     Plaintiff Langenfeld, due to the termination of Plaintiff Heffron, was required to absorb Plaintiff Heffron's very heavy patient caseload because Defendant Rehman refused to take over a proportionate amount of Plaintiff Heffron's cases.

109.     During the six-week period after GRC terminated Plaintiff Heffron, Plaintiff Langenfeld confronted and complained to Defendant Rehman about Defendants' decimation of the medical staff, the interference with physician's independent medical judgment, and requested Defendant Rehman join Plaintiff Langenfeld in confronting Defendant Rea about the worsening conditions and worsening patient care at GRC.

110.     Defendant Rehman informed Plaintiff Langenfeld that he would not work with him cooperatively and refused to improve any of the current management processes or procedures.

111.     Plaintiff Langenfeld then shared his concerns about conditions at GRC, and the worsening of patient care at GRC, in a written letter to Defendant Foxhoven.  Defendant Foxhoven acknowledged receipt of Plaintiff Langenfeld's correspondence, stated he had received multiple complaints from GRC staff, but failed to follow-up with Plaintiff Langenfeld, and failed to take any corrective action.

112.     Plaintiff Langenfeld also reported his serious concerns to the Iowa Department of Inspections and Appeals.

113.     During the period after Defendant Rea was hired and with Defendant Rehman as his supervisor, Plaintiff Langenfeld was treated maliciously, no concern was given to Plaintiff Langenfeld's well-being or excessive patient caseload, as he was forced to absorb Plaintiff Heffron's caseload, all medical and operational decision-making was made by Defendant Rehman or Rea, without input from or consultation with the medical staff, and patient care declined precipitously as a result of mismanagement that Plaintiff Langenfeld repeatedly reported.

Defendants repeatedly attempted to interfere with Dr. Langenfeld's independent medical judgment and interfere with his patient relationships.

114.    Plaintiff Langenfeld was constructively discharged from GRC as a result of the hostile work environment at GRC, and as a result of the ongoing attempts to interfere with his independent medical judgment.

115.    In particular, declining patient care, a lack of medical policies and decisions being made that were not consistent with the Consent Decree, the Manual or with best practices all contributed to the hostile work environment.

116.    Likewise, the harassment of staff and medical professionals, along with concern about perceived malpractice taking place at GRC that could threaten patients as well as Plaintiff Langenfeld's career, resulted in Plaintiff Langenfeld being constructively terminated from GRC.

117.    Plaintiff Langenfeld's forced departure from GRC constitutes constructive discharge due to the unsafe, malicious and hostile work environment created by Defendants Rea and Rehman and ratified by Defendants Foxhoven and Shults.

**PLAINTIFF KING**

118.    Plaintiff King, who also served as legal guardian for certain GRC patients, suffered harassment and adverse employment actions at the hands of GRC leadership, and the Defendants, given her outspoken role as protector of GRC patients.

119.    Plaintiff King verbally reported the hostile work environment, and other concerns, created by Defendant Rea to senior DHS policy-makers such Defendant Foxhoven on two different instances, after which no changes were made, and no action taken by DHS leadership.  But, the hostile treatment of Plaintiff King continued, as did the various reprisals against her.

120.    At the time Plaintiff King was undergoing harassment, Defendant Rea's improper medical experiments were beginning, of which Plaintiff King was critical.

121.    Plaintiff King, having made her reports, continued to be harassed and abused, and was forced to resign from GRC as a result of the hostile work environment.  Upon information and belief, Plaintiff King was constructively discharged from GRC because she was a vocal defender of the GRC patients and was unwilling to accede to Defendants' improper management of the GRC facility and/or improper use of GRC clients as research subjects.

## PLAINTIFF SHAW

122.    Plaintiff Shaw regularly reported her concerns about the conditions at GRC to her supervisors, including Defendant Rehman.  As a result, Plaintiff Shaw was regularly, and publicly, disparaged, harassed and criticized by Defendant Rehman.

123.    Defendant Rehman also directed Plaintiff Shaw to falsify or erase entries in medical records to hide damaging information Defendant Rehman did not want to appear in the regularly-audited patient record.  Plaintiff Shaw objected to being directed to take such actions.

124.    Plaintiff Shaw discussed her complaints about Defendant Rehman, and his treatment of her, to the GRC Human Resources Manager, but no action was taken.

125.    Plaintiff Shaw took leave from GRC for the birth of her child from on or about November 30, 2018 until January 11, 2019.  Upon returning from maternity leave, Plaintiff Shaw was regularly abused and harassed by Defendant Rehman for, among other things, her recent pregnancy and the birth of her child, and the healthcare needs of her family.

126.    In January or February 2019, Plaintiff Shaw lodged formal complaints with the Iowa Department of Inspections and Appeals regarding the reinstated use of physical restraints on GRC patients.

127.    In the Spring of 2019, Plaintiff Shaw notified Iowa Child Protective Services ("CPS") regarding concerns she had related to the treatment of the sole minor patient at GRC. Upon making such report, Plaintiff Shaw was informed by CPS that her report had been forwarded to DHS and would be investigated by DHS and at GRC.

128.    Within two weeks after Plaintiff Shaw's report to CPS, her locked office was entered and searched by the GRC HR Manager, presumably for information relating to her CPS complaint.  In her desk, the HR Manager found a resignation letter that Plaintiff Shaw had earlier prepared – given the above hostile work environment – but had decided not to submit.

129.    Plaintiff Shaw had not decided to and did not intend to resign from her job at GRC at the time her office was entered, and the now moot resignation letter was discovered.

130.    The non-resignation letter was discovered while Plaintiff Shaw was not on site at the facility.  Plaintiff Shaw received a call from the GRC HR Manager informing her that her resignation had been accepted and she was banned from entering the GRC campus.

131.    Plaintiff Shaw informed the HR Manager that she did not intend to resign, but she was ignored and GRC attempted to treat the separation of Plaintiff Shaw as a resignation.

132.    Plaintiff Shaw challenged this determination and, after notice and hearing, was determined by the Iowa Workforce Development agency to have been actually terminated, that she did not resign, and that she was entitled to unemployment payments from the State.

133.    Plaintiff Shaw was terminated from GRC, she did not intend to and did not resign her position at GRC.

134.    Plaintiff Shaw's termination was in retaliation for her repeated complaints and reports of improper medical care being provided, the violation of rules, statutes and laws, and the

failure to meet the standard of care created by the Consent Decree, the DHS manual and federal and state law.

136. Further, as discussed herein, Defendants Rea and Rehman, with the full knowledge, approval and ratification of Defendants Shults and Foxhoven, repeatedly interfered with the independent medical judgment of Plaintiffs Heffron, Langenfeld, and Shaw, harassed both Plaintiffs Heffron and Shaw, and terminated both Plaintiffs Heffron and Shaw in retaliation for both their exercise of their independent judgment, and their complaints about the facility leadership.

136. Each of the acts alleged herein were personally committed, authorized or directed by the named Defendants, acting in their individual and official capacities.  The actions committed, authorized or directed by the named Defendants, acting in their individual and official capacities, are the direct cause of the Plaintiffs' injuries.

**COUNT I**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**AGAINST DEFENDANTS FOXHOVEN, SHULTS, REA, AND REHMAN**

137. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

138. Plaintiffs were engaged in the exercise of their constitutional rights under the First Amendment of the United States Constitution when, among other things, they exercised their free speech rights communicating to state policy makers and others about the failure to comply with applicable laws and standards of care applicable to the protection of GRC's vulnerable population, when they sought to ensure continuation of the standards established in the DOJ Consent Decree, and when they attempted to exercise their independent medical judgment on behalf of their patients.

139.    Defendants' deprived Plaintiffs of their constitutional rights under the First Amendment of the United States Constitution when, among other things, they engaged in a concerted course of behavior intended to silence, punish and remove, by outright suspensions and firings, or due to a hostile work environment of each Plaintiffs.  Defendants collectively used various means, including unwarranted and unjustified reprimands, demotions, public humiliations, suspensions and terminations, by interfering with the independent medical judgment of healthcare professionals employed by GRC, by removing or amending formal mandated policies applicable to GRC employees and for the purpose of caring for GRC clients, by removing job responsibilities of Plaintiffs while employed at GRC, by engaging in acts of harassment, retaliation, reprisal, and punishment directed at Plaintiffs, etc.

140.    Defendants' actions were intentional, guided by malicious intent, and/or committed with reckless or callous disregard for the Plaintiffs' rights.  As such, Plaintiffs are entitled to an award of punitive damages sufficient to punish Defendants and to deter such future conduct of the kind inflicted on Plaintiffs.

141.    Defendants acts violated Plaintiffs' constitutionally protected rights.   The conspiracy and overt acts in furtherance of same have caused Plaintiffs to suffer damages for deprivation of constitutional rights, including, but not limited to, loss of wages, benefits, job security and other emoluments of employment and have suffered and will continue to suffer mental anguish, emotional distress and damage to their reputations.

**COUNT II**
**CONSPIRACY TO VIOLATE CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**AGAINST DEFENDANTS FOXHOVEN, SHULTS, REA, AND REHMAN**

142.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 141 as if fully set forth herein.

29

143.    Defendants, together and under color of state law, reached an agreement and engaged in a course of conduct and otherwise conspired amongst and between themselves to deprive Plaintiffs of their constitutional rights, including their right to free speech, by, among other things, retaliating against Plaintiffs in the terms and conditions of their employment and by attempting to silence them as advocates for GRC's residents.

144.    Defendants, together and under color of state law, committed the overt acts in furtherance of their agreement set forth herein, culminating in the separation of each of Plaintiffs from their employment at GRC.  Defendants did so through various means, including unwarranted and unjustified demotions, public humiliations, suspensions and terminations, by interfering with the independent medical judgment of healthcare professionals employed by GRC, by removing or amending policies applicable to GRC employees and for the purpose of caring for GRC clients, by removing job responsibilities of Plaintiffs while employed at GRC, by engaging in acts of harassment, retaliation and punishment directed at Plaintiffs.

145.    Defendants' actions were intentional, guided by malicious intent, and/or committed with reckless or callous disregard for the Plaintiffs' rights.  As such, Plaintiffs are entitled to an award of punitive damages sufficient to punish Defendants and to deter such future conduct of the kind inflicted on Plaintiffs.

146.    Defendants acts violated Plaintiffs' constitutionally protected rights.   The conspiracy and overt acts in furtherance thereof have caused Plaintiffs to suffer damages for deprivation of constitutional rights, including, but not limited to, loss of wages, benefits, job security and other emoluments of employment and have suffered and will continue to suffer mental anguish, emotional distress and damage to their reputations.

## COUNT III
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
## AGAINST ALL DEFENDANTS

147.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 146 as if fully set forth herein.

148.    Plaintiff Heffron was terminated by Defendants after reporting his concerns regarding GRC management and opposing their interference with his independent medical judgment and the standard of care applicable to patients at GRC.

149.    Plaintiff Heffron's termination was the result of Plaintiff Heffron's efforts to ensure the law and proper standards of patient care were followed, in the exercise of his independent medical judgment despite the interference from Defendants Rea and Rehman, which such interference was ratified by Defendants Shults and Foxhoven, and to permit Defendants Rea and Rehman to shift the focus of GRC from proper patient care to an experimental research facility.

150.    Plaintiff Heffron was suspended without cause approximately one month after joining a vote of no confidence against Defendant Rehman.  Upon information and belief, his suspension and later termination were reprisals for opposing Defendant Rea's dangerous practices.

151.    Plaintiff Heffron's termination violates well-established public policy of the State of Iowa as defined by statute, regulation and judicial decision, which public policy would be undermined and jeopardized under the circumstances in this case.

152.    Plaintiff Heffron was terminated as a result of his participation in protected activity and Defendants' failure to proffer any valid reason for his termination demonstrates the lack of any legitimate justification for such termination.  Plaintiff Heffron's termination constitutes wrongful discharge in violation of the public policies of Iowa.

153.    Plaintiff Shaw was also terminated, though the State of Iowa and GRC initially attempted to treat Plaintiff Shaw's separation as a resignation.

154.    In fact, Plaintiff Shaw did not intend to resign from GRC, but was forced out of GRC as retaliation for her lodging complaints regarding the interference made with her independent medical judgment, as a result of her complaints about being directed to falsify medical records, and her complaint to Child Protective Services regarding concerns she had about the care of a pediatric patient at GRC.

155.    Plaintiff Shaw's termination, pretextually and falsely designated as a resignation by Defendants, was later confirmed by the award of unemployment benefits in her favor by the Iowa Workforce Development.

156.    The remaining Plaintiffs each were forced from their positions at GRC, as outlined above.  Each did so as a result of the hostile working environment created by Defendants Rea and Rehman, which environment was ratified by the acts and omissions of Defendants Foxhoven and Shults, acting in their independent and official capacity.

157.    Each of these Plaintiffs' removals were involuntary and were in the nature of a constructive termination of employment which was prompted by a violation of their rights, the creation of a hostile work environment at GRC by Defendants Rea and Rehman, which was ratified by the acts and omissions of Defendants Foxhoven and Shults, acting in their independent and official capacity.

158.    The hostile work environment at GRC was made in part as retaliation for Plaintiffs' exercise of their right to free speech and as a result of concerns raised by Plaintiffs about conduct which was in direct violation of recognized public policies existing within the state of Iowa, as discussed herein.

159.    The constructive termination of the Plaintiffs violates well established public policy of the State of Iowa as defined by statute, regulation and judicial decision, which public policy would be undermined and jeopardized under the circumstances in this case.

160.    Plaintiffs were constructively terminated as a result of their participation in protected activity and Defendants lack of any legitimate justification for such constructive termination.  The constructive termination of these Plaintiffs constitutes wrongful discharge in violation of the public policies of Iowa.

161.    Defendants' conduct constituted a willful and wanton disregard for the rights or safety of Plaintiffs and caused actual damage to Plaintiffs.  As such, Plaintiffs are entitled to an award of punitive damages against Defendants.

162.    The discharge of Defendants Heffron and Shaw and constructive discharges of the remaining Plaintiffs caused each of the Plaintiffs damage, including, among other things, loss of wages, benefits, job security and other emoluments of employment and mental anguish, emotional distress and damage to Plaintiffs' reputations.

**COUNT IV**
**CONSPIRACY FOR WRONGFUL TERMINATION**
**IN VIOLATION OF PUBLIC POLICY**
**AGAINST ALL DEFENDANTS**

163.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 162 as if fully set forth herein.

164.    Defendants reached an agreement and engaged in a course of conduct and otherwise conspired amongst and between themselves to facilitate the termination and/or constructive termination of Plaintiffs as discussed herein.

165.    Defendants, in furtherance of that agreement, committed the overt acts set forth herein, culminating in the separation of each of Plaintiffs from their employment at GRC.

Defendants did so through various means, including unwarranted and unjustified suspensions and terminations, by interfering with the independent medical judgment of healthcare professionals employed by GRC, by removing or amending policies applicable to GRC employees and for the purpose of caring for GRC clients, by removing job responsibilities of Plaintiffs while employed at GRC, by engaging in acts of harassment, retaliation and punishment directed at Plaintiffs.

166.    Defendants' conduct constituted a willful and wanton disregard for the rights or safety of Plaintiffs and caused actual damage to Plaintiffs.  As such, Plaintiffs are entitled to an award of punitive damages against Defendants.

167.    As a result of the conspiracy, each of Plaintiffs were separated from their employment at GRC and suffered damages.  The conspiracy and overt acts in furtherance thereof have caused Plaintiffs to suffer damages including, but not limited to, loss of wages, benefits, job security and other emoluments of employment and have suffered and will continue to suffer mental anguish, emotional distress and damage to their reputations.

## COUNT V
## VIOLATION OF WHISTLEBLOWER LAW – IOWA CODE § 70A.28
## AGAINST ALL DEFENDANTS

168.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 167 as if fully set forth herein.

169.    Each of Plaintiffs were harmed and otherwise disadvantaged in connection with his or her employment as a consequence of Defendants' wrongful conduct.

170.    Defendants' wrongful conduct towards the Plaintiffs was undertaken, in substantial part, as reprisals against Plaintiffs for their complaints, to government agents and policy-makers, regarding the management of GRC, the quality of patient care being provided at GRC, GRC's failure to comply with federal laws and standards of care for disabled patients, for GRC

management's interference with the independent medical judgment of healthcare professionals, among other matters.

171.    When Plaintiffs engaged in the communications described herein, they reasonably believed that violations of laws or rules, mismanagement, gross abuses of funds, and/or abuses of authority were occurring at GRC and their complaints were intended to correct such violations, mismanagement or abuses, and thereby serve the public interests of all Iowans, including GRC's residents.

172.    Defendants' conduct in attempting to silence Plaintiffs speech, and/or in retaliating against Plaintiffs in the terms of their employment, violated the provisions of Iowa Code § 70A.28.

173.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and will continue to suffer damages, including, but not limited to, loss of wages, benefits, job security and other emoluments of employment and have suffered and will continue to suffer mental anguish, emotional distress and damage to their reputations.

174.    Plaintiffs are entitled to damages recoverable by statute, attorney fees, costs, and appropriate equitable relief pursuant to the provision of Iowa Code § 70A.28(5).

## COUNT VI
## TORTIOUS INTERFERENCE WITH PHYSICIAN-PATIENT RELATIONSHIP
## AGAINST ALL DEFENDANTS BY PLAINTIFFS HEFFRON AND LANGENFELD

175.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 174 as if fully set forth herein.

176.    Each of Plaintiffs Heffron and Langenfeld were medical professionals retained by GRC to provide medical services to GRC residents.

177.    Plaintiffs Heffron and Langenfeld, as physicians, had an established physician-patient relationship with, and profession duties toward each of the GRC clients under their care.

178.     Each of Defendants, due to their role in the GRC and/or DHS organization, along with communications had with Plaintiffs Heffron and Langenfeld, were aware, or should have been aware, of the existence of a patient-physician relationship between Plaintiffs Heffron and Langenfeld and the GRC clients under their care.

179.     Defendants, intentionally and without justification, interfered in the physician-patient relationship then existing between Plaintiffs Heffron and Langenfeld and the GRC clients. Defendants did so by, among other things, directing that medical and medication decisions be made to facilitate research purposes, not patient care, by directing the use of "hydration therapy" and focus on the "Perfect Care Index" irrespective of Plaintiffs Heffron and Langenfeld's independent medical judgment, directing the use of "monotherapy," or ordering the use of fewer diagnostic tests and other medical care in order to save costs.

180.     Defendants' interference in the physician-patient relationship between Plaintiffs Heffron and Langenfeld and their GRC client patients, led, in part, to Plaintiffs' Heffron and Langenfeld's separation from GRC.

181.     Defendants' interference in the physician-patient relationship between Plaintiffs Heffron and Langenfeld and their GRC client patients, additionally interfered with their professional relationships with each GRC client and interfered with Plaintiffs' Heffron and Langenfeld's exercise of their independent medical judgment.

182.     As a result of Defendants knowing and intentional inference, Plaintiffs Heffron and Langenfeld were damaged in amounts to be established at trial.

WHEREFORE, Plaintiffs pray for judgment against the defendants as follows:

A.      Damages in an amount that will fairly and justly compensate Plaintiffs for the violation of their civil rights, mental anguish, pain and suffering, lost earnings and benefits and damage to their reputations.

B.      Punitive damages in an amount sufficient to adequately punish defendants and to deter future conduct of the kind inflicted on Plaintiffs.

C.      Attorney's fees pursuant to 42 U.S.C. § 1988 and Iowa Code § 70A.28.

D.      The costs of this action and for such other and further relief as this Court deems equitable and proper.

**JURY DEMAND**

Plaintiffs hereby demand a jury trial on all issues presented herein.

DATED this 10th day of February 2020.

KELLY BRODIE,
DR. JOHN HEFFRON,
KATHERINE KING,
DR. MICHAEL LANGENFELD,
KATHERINE RALL,
JAMIE SHAW, Plaintiffs.


/s/ Kathryn E. Jones
Kathryn E. Jones, #17224
Thomas J. Kenny – *pro hac vice forthcoming*
Edward M. Fox II – *pro hac vice forthcoming*
KUTAK ROCK LLP
The Omaha Building
1650 Farnam Street
Omaha, NE  68102-2186
(402) 346-6000
(402) 346-1148
Kate.Jones@kutakrock.com
Thomas.Kenny@kutakrock.com
Edward.FoxII@kutakrock.com

Thomas White – *pro hac vice forthcoming*
White & Jorgensen
3114 St. Mary's Avenue
Omaha, NE  68105
Telephone 402-346-5700
twhite@whitejorgensen.com